KURN et al., Trustees, v. BAYLESS.

No. 31411.   June 25, 1946.

Rehearing Denied Oct. 1, 1946.

*172 P. 2d 779.*

M. G. Roberts, of St. Louis, Mo., Ben Franklin, and Cruce, Satterfield & Grigsby, all of Oklahoma City, and Doerner, Rinehart & Stuart, of Tulsa, for plaintiffs in error.

Hughey Baker, of Tulsa, for defendant in error.

DAVISON, J. Elizabeth M. Bayless, hereinafter referred to as plaintiff, commenced this action against James M. Kurn et al., trustees of St. Louis & San Francisco Railway Company, hereinafter referred to as defendants, seeking damages for personal injury sustained by her while alighting from a passenger car at Tulsa, Okla., on the morning of June 11, 1942.

Plaintiff was a passenger for pay on the occasion under review; she was aged and infirm and carried a walking stick for assistance. She was also carrying a paper bag. She and her son testified to the same general effect that she waited for most of the passengers to get off the train at Tulsa; she then proceeded to the platform of the vestibule for the purpose of descending the steps to the station platform; she was unattended and unassisted by any person until she stepped on the second step from the platform of the vestibule, whereupon something happened to cause one of her feet to slip off the step or turn back or hang. The testimony is somewhat indefinite as to just which of these things happened. She hesitated a minute or two at this point and with her hand raised her foot back on the step. Upon this occurrence a soldier who was behind her offered to and did

assist her by holding her arm and taking her luggage; the son at about the same time and for the same reason and purpose reached up from the station platform at the foot of the steps leading to the platform of the vestibule and took her by the hand; the son had come to the train to meet her, saw her through the window and moved through the other departing passengers and suit cases to the point on the platform where he was able to reach her hand.

The injury complained of was a broken hip. There was no question about her having received such an injury. One of the important questions, however, is the exact time the hip was broken. In answer to a question as to when her hip was broken she testified, "I was going down them steps". Further direct testimony was introduced at this particular point as follows:

"Q. Did you ever have trouble with your hip before? A. Never had pain. Q. Until when? A. Until after I got my foot hung. Q. Do you know what step you were on when you broke your hip? A. The second step, the best of my judgment. Q. When you took the next step, what did you say, what happened? A. When I stepped down, I think it was the last step, anyhow the next step I took, that leg gave way. I was in so much pain, I would have fainted if my boy wasn't standing there. Q. Would you have fallen? A. Yes, sir. Q. Did you fall into him? A. Into him, and kept me from falling."

The plaintiff testified that she was assisted onto the train at Monett, Mo., by her daughter and niece; that they both helped her on the train and into a seat at the center of the coach; that this was in the presence of the porter who offered to assist her but was told by her that no help was needed. Plaintiff gave no personal notice of her infirmity to the employees of defendant, nor made any request for assistance.

A portion of the testimony of Clyde Bayless, the son who met plaintiff at the train, insofar as it pertains to the injury, is as follows:

"Q. Did you see your mother at the top of the steps? A. The first time I saw her back in the coach . . . Q. Tell the jury what she did, what you did, what happened? A. She walked forward to where you come off the train. I went up to meet her. It was hard to get through. I got to the foot of the stairs. Q. Did it take some time to wheel your way through? A. Yes, sir. Q. All right. A. She started down with a cane, and little hand bag, and stopped. I reached up to get her. She said, 'Wait until I get my foot loose' . . . She reached down to get her foot loose. I got hold of her. She came down and almost fell . . . Q. Was she able to walk after that without help? A. You couldn't say she ever walked after that. I practically carried her to the foot of the stairs (depot stairs)".

Plaintiff on cross-examination further testified that no one helped her from the train until after she had reached the second step where she was injured; she stated that she would have accepted help. When asked why she didn't request help she stated that there was no one there; that the reason she did not request help was she thought someone would be there to help her.

The evidence further discloses that immediately after plaintiff alighted from the train she was taken in a taxi to the home of her son. That evening a doctor was called and examined her. On the following day she was taken to the hospital.

Dr. MacKenzie, a bone specialist who examined her the second day after the alleged injury, testified that the right hip bone was completely severed at the point of fracture and that the separation was complete. As to the effect of such a fracture his testimony, by question and answer, is as follows:

"Q. That condition would immediately affect her? A. Yes, sir. Q. Ordinarily within seconds? A. Yes, sir. Q. Assuming that I suffered here this instant, I would suffer that kind of an injury, it would affect me immediately. Is that what you are telling us? A. Yes."

The porter denied the incident testified to by plaintiff as occurring at Monett. He and the conductor both testified they had no recollection of seeing plaintiff at the time she got on the train

The conductor testified that when the train arrived in Tulsa he went to the telegraph office for train orders and to leave some messages. The porter testified that he had no independent recollection of plaintiff or having seen plaintiff at any time on the trip.

The defendants introduced in evidence a statement which had been made by plaintiff while in the hospital, which statement had been taken by Mr. Head, who was a claim agent for defendant. This statement consisted of over three pages and gave an account of the accident. It was stated in a part of the statement that plaintiff had had a previous accident about eleven days before the one in question in which she had injured her right hip in a fall but thought it was more in the knee than the hips and that she had no doctor with the injury.

The plaintiff was cross-examined at length about the above statement and her testimony was that the adjuster must have misunderstood her. Her testimony was very positive that she did not tell the adjuster about a previous injury to her hip because, as she testified, the previous injury was entirely to the knee. The statement was prepared by the adjuster while she was in her hospital bed and she testified that she signed same without reading it. Plaintiff's testimony to the effect that she had not broken her hip in the previous fall is corroborated by Dr. MacKenzie. The crux of his testimony was to the effect that in his opinion the condition of plaintiff was caused on June 11th, and not by a previous injury, for the reason that had she had such an injury on June 1st "she wouldn't have been able to get around at all,"

The defendant takes the position that plaintiff has failed to connect up her injury with the alleged acts of negligence on the part of the defendant in the following particulars:

1. That the facts fail to support a claim of an extra duty owed to plaintiff to assist her off the train.

2. That even if shown that plaintiff fell within the excepted class of passengers who are entitled to special care, there was nothing which could have been done by the trainsmen that was not done by her son and the soldier.

3. That there is nothing in the record to show that plaintiff's injury occurred before she was in complete custody of her son at the bottom of the step, and that the evidence was too vague as to exactly how her first misstep occurred, assuming that it could have caused her injury, to connect it with the alleged failure on the part of the defendant to assist her—or that her heel would not have slipped back had she been at the time assisted by the porter or conductor.

The foregoing grounds constituted the theory upon which defendant demurred to the evidence of the plaintiff. The demurrer was overruled and the cause resulted in a verdict by the jury in favor of plaintiff in the sum of $2,500.

With the foregoing facts and theories in mind it now becomes necessary for us to examine the law applicable thereto.

The rule established and long recognized in this state as to the duty of a carrier to its passenger under its contract of carriage is that it will carry the passenger safely and in a proper vehicle and afford him safe and convenient means for entering its cars and alighting therefrom, but it does not contract to render him personal service or attention beyond that, except where the passenger, by reason of illness, great age or other infirmity, is in need of assistance. St. Louis & San Francisco Railway Co. v. Fick, 47 Okla. 530, 149 P. 1126; St. Louis & San Francisco Railway Co. v. Lee, 37 Okla. 545, 132 P. 1072. The foregoing exception to the general rule under our determination of this issue has no application though it is generally accepted that whether a specified person comes within the recognized exception to the general rule is a question for determination by the jury from all the facts and circumstances in evidence under proper

**524**

instructions. St. Louis & San Francisco Railway Co. v. Dobyns, 57 Okla. 643, 157 P. 735.

It was also held in the case of Dickinson et al. v. Tucker, 74 Okla. 43, 176 P. 949, that in the case of a sick, old, or infirm passenger, or one making a request for assistance, it undoubtedly is the duty of the company to assist them, and in cases where, by the use of ordinary care the conductor, or other employee, sees that such help is needed, it becomes the duty of the company to furnish such assistance.

13 O.S. 1941 § 32 provides as follows:

"A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill."

The testimony of plaintiff relative to the particular occurrence of her being helped on the train at Monett by two relatives in the presence of the porter, coupled with the further testimony of her receiving the broken hip in getting off the train at Tulsa, at a time when she was unassisted, was sufficient to withstand a demurrer to plaintiff's evidence.

The court fairly instructed the jury on all questions of law. The jury had the opportunity of seeing the witnesses while testifying and to determine the truthfulness of their testimony. There being some evidence which would justify the conclusion that she was within the excepted class, and that the injury sued upon happened at the time, at the place, and in the manner as testified to by plaintiff, and the verdict being approved by the court, under our established rule, we cannot interfere with the verdict of the jury, there being some evidence to support it.

Judgment affirmed.

HURST, V.C.J., and RILEY, OSBORN, WELCH, and CORN, JJ., concur. GIBSON, C.J., and ARNOLD, J., dissent.